FARNELL, CROCKETT, Associate Judge.
Accela, Inc., and CRW Systems, Inc., appeal from a final judgment denying their request for several forms of relief, including a declaration that three contracts executed by Sarasota County and CSDC Systems, Inc., are void. We reverse because Sarasota County failed to follow the requirements of its Procurement Code when it entered into the contracts with CSDC.

Background

In 1996 the Sarasota County government (“the County”) began using a software package known as Tidemark to keep track of zoning, building permits, and other aspects of land management within the county. By about 2001, however, the County had determined that Tidemark was no longer meeting its needs and that efforts to upgrade or otherwise resolve issues with the software were not working. The County therefore began searching for a replacement system. In 2002, a committee formed to evaluate candidates for the new system visited other government entities to examine several software products. The committee determined, however, that none of the systems reviewed would meet the County’s needs.
At a building officials conference in May 2002, a County employee learned of a software system made by CSDC called Amanda. In January 2003, CSDC demonstrated the system for the County. After further investigation of the product by County employees, including site visits to two local governments that were already running Amanda after a conversion from Tidemark, the County concluded that, among the several systems it had reviewed, Amanda would best meet its needs. County officials further determined that the most appropriate way to procure the system from CSDC would be for the parties to draw up agreements that adopted the terms of existing procurement contracts between CSDC and another government entity that had acquired the Amanda system, a process permitted by the County’s Procurement Code (“the Code”) as long as certain requirements are met. This process is called “piggybacking.”
The Amanda software system comprises multiple modules, some of which form the core of the system and must therefore be installed by all users and some of which are optional add-ons. After detailed discussions between the County and CSDC as to what components of Amanda the County would need, CSDC forwarded copies of three agreements for Amanda executed between CSDC and the Department of Agriculture, Trade and Consumer Protection of the state of Wisconsin (“Wisconsin”): [1] an agreement for the purchase of the software itself, an implementation *1038 agreement (for installation of and training in the software), and a maintenance agreement. The agreements were structured with the general terms printed first in standard contract sectional format and the cost itemization of specific modules (for the software and maintenance agreements) and services (for the implementation agreement) set forth in tabular format in appendixes.
County employees reviewed the Wisconsin agreements, pointing out changes that would have to be made. Most of the alterations to the textual portion of the agreements requested by the County were merely technical, such as changing the words- “state of Wisconsin” to “Sarasota County.” However, the changes to be made in the tabular sections of the agreements were more extensive. These changes were the result of several factors, including the respective applications of the software (Wisconsin was using Amanda in the agricultural context, for such purposes as tracking milk trucks; the County, for land management),[2] the number of individual users of the software in the respective governments, and the amount of time required for installing the software and training its users. The final draft of the County-CSDC software agreement contained a list of forty Amanda modules at a total cost of $711,120; the Wisconsin-CSDC had nine modules at a cost of $176,200. Eight modules were common to the two agreements. The County would pay $688,621.60 for implementation; Wisconsin’s agreement was for $269,640. Finally, the County’s and Wisconsin’s respective maintenance agreements listed first-year costs of $179,016 and $31,716. The Board of County Commissioners (“the Board”) made the final decision to approve the agreements, and the chair of the Board signed them.
In August 2003, Accela, a competing vendor of tracking software, filed a complaint against the County and CSDC, alleging that the County violated its own Procurement Code by not going through a competitive process in procuring CSDC’s Amanda software. Accela asked the court to declare the three agreements in violation of the Code and to declare them void, to enjoin the County and CSDC from performing the agreements, and to order the County to procure a software product through a competitive procurement process. CRW, another software vendor, moved to intervene and consolidate in November 2003 and filed a complaint virtually identical to Accela’s. The court granted CRW’s motion, and the case was tried before the court in January and February 2006. The court denied the relief requested, and Accela and CRW have appealed.

Burden of proof and standards of review

The parties are at odds over the appropriate standard of review that the trial court was to have used. Because our analysis of the merits, below, makes it clear that piggybacking is a competitive process, analogous to bidding or sealed proposals, we conclude that the trial court was required to determine whether the County acted arbitrarily or capriciously in entering into the agreements with CSDC. See Emerald Corr. Mgmt. v. Bay County Bd. of County Comm’rs, 965 So.2d 647, 652-53 (Fla. 1st DCA 2007) (summarizing cases standing for the proposition that the arbitrary and capricious standard applies to local governments’ handling of bids and competitive proposals). Even with this relatively deferential level of review, however, a public entity must follow its own *1039 laws for a contract with the entity to be valid. See City of Hollywood v. Witt, 789 So.2d 1130, 1131-32 (Fla. 4th DCA 2001) (“In order for a contract with a city to be valid, it must comply with the city charter or ordinances.”); see also Town of Indian River Shores v. Coll, 378 So.2d 53, 55 (Fla. 4th DCA 1979) (concluding that a local ordinance requiring the town council to authorize employment of persons nullified an employment contract when the mayor on his own hired a secretary); cf. Palm Beach County Health Care Dist. v. Everglades Mem’l Hosp., Inc., 658 So.2d 577, 581 (Fla. 4th DCA 1995) (holding that “[a]greements entered into by public bodies which fail to comply with statutory requirements are void”); Martin County v. Yusem, 690 So.2d 1288, 1295 (Fla.1997) (noting that, in the context of the deferential “fairly debatable” standard applicable to a local government’s legislative action, the action “still must be in accord with ... local ordinances”).
In this court,
[o]ur review is guided by the well-established rule that the trial court’s decision in a declaratory judgment action is accorded a presumption of correctness and will not be rejected on appeal unless based on a misapplication of law or shown by the record to be clearly wrong, or against the manifest weight of the evidence, or not supported by competent substantial evidence.
Williams v. Gen. Ins. Co., 468 So.2d 1033, 1034 (Fla. 3d DCA 1985). To the extent that our analysis requires that we construe the Code, our review is de novo. See State v. Hanna, 901 So.2d 201, 204 (Fla. 5th DCA 2005) (“The interpretation of a statute or an ordinance is a purely legal matter and is subject to de novo review.”).
On appeal, Accela argues that the defendants, the County and CSDC, had the burden of proving that the piggyback exception in the County’s Procurement Code applied to the transaction at issue and was properly exercised. We find Ac-cela’s argument unpersuasive and conclude that the burden remained with the plaintiffs to demonstrate their claims. Cf. Zurla v. City of Daytona Beach, 876 So.2d 34, 35 (Fla. 5th DCA 2004) (noting that plaintiffs burden to prove its claim that regulations at issue were arbitrary and capricious was to negative every conceivable basis that could support them).

Merits

The Sarasota County Procurement Code in effect at the time when the County and CSDC entered their three agreements required that goods and services costing over $25,000 be made only by competitive sealed bids or competitive sealed proposals. Sarasota County, Fla., Procurement Code § 2-256 (2003) (hereinafter Procurement Code). Exceptionally, however:
The Purchasing and Contracts Manager shall have the authority to utilize contracts of other local governments or recent Sarasota County contracts or other public entities to procure goods and services if the vending contractor extends the terms and conditions of the contract to the County of Sarasota and the contract has been awarded through procedures substantially equivalent to the requirements of [the Procurement Code].
Id. at § 2-256(3). This is the so-called piggyback provision. Restated as elements, the provision allows the County to utilize an existing contract to procure goods and services when (1) the purchasing party to the existing contract is a local government or other public entity, or Sarasota County itself; (2) the vendor-party to the existing contract extends the terms and conditions of that contract to the County; and (3) the other government entity, in awarding the vendor the earlier *1040 contract, used procedures substantially similar to those that the Code requires the County to use.
Jack Haley, a County contracts management specialist who testified at trial, explained the two competitive procurement methods used by the County and the piggyback process. The County invites vendors to submit bids, in a process called “invitation for bids” or “invitation to bid” (ITB), when it knows exactly what it needs and the only consideration is which vendor can provide the best price. Competitive sealed proposals are received from vendors after the County has published a “request for proposals” (RFP). An RFP is used when the County has only a general idea of what it needs but may not be aware of what is available in the marketplace. Furthermore, the focus is not necessarily on cost, but can instead be on the overall quality or scope of the products or services offered by the respective vendors. Because such additional factors are considered, it is not necessarily the vendor submitting the lowest-cost proposal who wins the contract. Finally, Mr. Haley described the piggyback process as a competitive alternative to bidding and to competitive sealed proposals that saves time and work because the County can avail itself of a contract for a given product or service already entered into by another government entity with the same vendor the County wishes to use. As occurred here and is apparently often the case, the County uses the piggyback process when it already knows which vendor’s product or service it prefers. If another government entity has already purchased that product or service and as long as the other entity used procedures “substantially equivalent” to those of the Code to do so, the County need not go through its own competitive process but can utilize the other entity’s contract with the vendor.[3]
Although there was some dispute at trial, Accela and CRW do not argue on appeal that Wisconsin’s Department of Agriculture, Trade and Consumer Protection is not a “public entity” contemplated by the first element of the piggyback provision. Furthermore, based on our review of the record we conclude that no significant issue exists as to the third element, whether Wisconsin’s procedures were substantially similar to those required by the County’s Procurement Code. The County and CSDC presented competent evidence that Wisconsin engaged in an RFP “substantially equivalent” to the County’s before deciding to purchase the Amanda software system. Thus, the only element of the piggyback exception at issue is the second: whether CSDC “extend[ed] the terms and conditions of the [Wisconsin] contract to the County” as contemplated by the Code. We conclude that the second element was not satisfied. Our conclusion is based primarily on our interpretation of how the piggyback exception fits into the overall scheme of the Procurement Code.[4]
The Code begins with a purpose statement that emphasizes competition:
The purpose and intent of [the Procurement Code] is:
(1) To simplify and clarify the law governing the County of Sarasota’s procurement system;
(2) To ensure the fair, equitable, and uniform treatment of all persons who *1041 deal -with the procurement system of this County;
(3) To foster effective broad-based competition within the free enterprise system in procurement activities.
Procurement Code, § 2-252. The Code introduces its list of procurement methods with a statement that two competitive processes comprise the default methods to be used:
No procurement of goods and services in excess of $25,000.00 shall be made unless upon competitive sealed bids or proposals received in the manner hereinafter prescribed.
(1) When the Purchasing and Contracts Manager determines that the use of competitive sealed bidding is either not practicable or not advantageous to the County of Sarasota, a contract may be entered into by competitive sealed proposals.
Procurement Code, § 2-256(1) (emphasis added). Notwithstanding the mandatory language of its introductory paragraph, section 2-256 lists a number of exceptions to the requirement of competitive bids or proposals. These exceptions include the “sole-source” exception, which allows the County to contract for a good or service without competitive bidding when only one vendor for the good or service exists, id. at § 2-256(4)(a); certain “routine purchases,” id. at § 2-256(4)(b); the emergency exception, which allows the Board of Commissioners to suspend any or all provisions of the Code to authorize an emergency procurement when an “emergency procurement condition” arises, id. at § 2-256(5); the procurement of certain professional services, id. at § 2-256(6); and the piggyback provision, id. at § 2-256(3).
Ignoring for the moment the piggyback provision, we note that these exceptions to the requirement of competitive bidding or competitive proposals share either of two mutually exclusive features: they either require some degree of competition or concern goods or services that inherently do not entail competition. For example, emergency procurements may be authorized when certain conditions are met, but they are nevertheless subject to the proviso that “such emergency procurement be made with such competition as is practicable under the circumstances.” Id. at § 2-256(5). Similarly, when the County procures architectural, engineering, and other professional services, section 2-256(6) of the Code requires the County to do so in compliance with section 287.055, Florida Statutes, which involves “competitive selection” and “competitive negotiation” as opposed to competitive bidding or proposals. § 287.055(4), (5), Fla. Stat. (2003). Additionally, the Code requires the county administrator to “establish procedures for competitive negotiations.” Procurement Code, § 2-256(6).
In contrast, certain purchases do not lend themselves to competition. The most obvious example of this is the sole-source exception, used when only one vendor for the good or service exists. Procurement Code, § 2-256(4)(a). The “routine purchases” listed in section 2 — 256(4)(b) also tend to be items entailing minimal or no competition, including: replacement parts for existing equipment when these are not available on the open market, furnishings to match existing County furnishings, “software available from the originator with no competitive brands,”[5] and the like. Id. at § 2~256(4)(b). Even in this category, however, “[t]he Purchasing Manager *1042 shall take all reasonable steps to insure that the specifications for an item to be procured are developed to permit competition among businesses whenever practicable.” Id.
We conclude from the dichotomy just described that the piggyback provision must entail one and only one of the two possibilities: either it applies to the procurement of products and services that are not by their nature competitive or it entails an inherently competitive process. We further conclude that the latter is the correct option. First, the provision applies to “good and services’-’ in general; no inherently noncompetitive categories are listed. Moreover, the third element of the provision requires that the contract piggybacked onto be “awarded through procedures substantially equivalent to the requirements of [the Procurement Code].” Although the parties disputed whether this element was satisfied, there was no dispute that it had to be satisfied by a competitive RFP (or perhaps bidding) process undertaken by Wisconsin in awarding its contracts to CSDC.[6]
Our conclusion that the Code requires the piggyback process to be competitive influences our interpretation of the second element of the piggyback provision and our analysis of whether CSDC “extend[ed] the terms and conditions of the [Wisconsin] contracts] to the County.” Id. at § 2-256(3). Although perhaps expressed in a different way, the County and CSDC’s argument on appeal is essentially that the terms in the Wisconsin agreements were offered to the County and do appear in the County-CSDC contracts, along with additional line items (modules) and a larger number of users, factors that expanded the cost of all three contracts. Notwithstanding the expanded scope, however, the County and CSDC argue that the unit prices of the eight respective core modules common to the Wisconsin and County software and maintenance contracts were the same, the unit prices of the additional modules purchased by the County were from the same price list as the eight core modules, and the pricing of the Wisconsin and County implementation contracts was comparable in terms of unit price.[7] In short, as long as the terms of the Wisconsin contracts are included in the County contracts, the County and CSDC argue, it does not matter that the scope of the contracts was expanded. Reduced to simplest terms, Accela and CRW’s argument is that, excepting such technical changes as the name of the purchaser, the requirement of “extending] the terms and conditions” means that the County contracts must be the same as the Wisconsin contracts as to both wording and scope; the requirement does not permit the purchase of thirty-two additional modules or the additional installation, training, and maintenance costs resulting from the extra modules and the larger number of users.
In light of our interpretation that the piggyback provision requires that competition be maintained in the piggyback process, we agree with Accela and CRW’s position, though not necessarily in every detail. Case law construing RFP and bidding requirements, while not perfectly analogous to the present case, is instructive. For example, in State, Department of Lottery v. Gtech Corp., 816 So.2d 648 (Fla. 1st DCA 2001), second-place vendor Gtech disputed the award of a contract by *1043 the Lottery to a competitor, AWI, in response to an RFP. Gtech alleged that the contract executed by the Lottery and AWI contained provisions never contemplated in the RFP. The new provisions were the result of negotiations between the Lottery and AWI undertaken after AWI’s proposal was selected as the winner. Gtech’s theory was that AWI won the contract because AWI “low-balled” its proposal and then negotiated terms more favorable to it than initially proposed. The trial court granted Gtech’s motion for summary judgment and declared the contract void, finding contrary to Florida law the Lottery and AWI’s assertion that they were no longer bound by the relevant competitive bidding statutes once competitors were eliminated via the RFP process. Id. at 649-51. The court affirmed, noting that “[t]o countenance the Lottery’s entry into a contract that was materially different than AWI’s proposal would encourage responders to RFPs to submit non-competitive, unrealistic proposals solely for the purpose of receiving the highest ranking for subsequent negotiations.” Id. at 652. The court held that
Gtech was entitled to rely on the RFP process in submitting a responsive proposal under Florida’s system of competitive bidding and that the Lottery now cannot ignore those laws in reaching a new agreement which may in the final analysis bear little resemblance to the proposal that earned AWI preferred provider status in the first instance.
Id. at 653. An analogous principle applies to competitive bidding solicited by a government entity. See Robert G. Lassiter & Co. v. Taylor, 99 Fla. 819, 128 So. 14, 17 (1930) (“[T]he city could not circumvent the charter provision by first entering into a legal contract for pavement in accordance with plans and specifications [set forth in the notice to bidders,] and later, by agreement, change the contract to a different type of pavement or make a new contract. That would be doing indirectly what could not be done directly.” (internal quotation marks omitted)).
In light of these principles, and given that the piggyback process contemplated by the Code is intended to be competitive, we cannot agree that the County and CSDC’s contract-making process represented a valid manifestation of the piggyback provision. That is, the County was not permitted to use another entity’s contracts merely as a “basis to begin negotiations,” as testified to at trial by the County’s Mr. Haley and urged by the County in its brief. Under this view, the County could use an existing contract in which a minimal amount of goods or services were listed and then expand the scope of the contract (i.e., the number or volume of goods or services purchased) at will, regardless of how competitive or noncompetitive the pricing of the additional goods or services would be. In short, we must conclude that the only reading under which the “extends the terms and conditions of the [existing] contract to the County” element allows the piggyback provision to be competitive is that the terms, including the scope,[8] of the County contract must be substantially the same as those of the existing contract. That is, it is the terms that appear in a final County-vendor contract that constitute the terms that that the vendor has extended to the County.[9] *1044 Because the terms of the three County-CSDC agreements represent a significant expansion beyond those of the Wisconsin-CSDC agreements, we must conclude that the County acted arbitrarily and capriciously when it violated the terms of the piggyback provision of its Code in entering into the three agreements. The agreements must therefore be deemed void and of no effect. See Witt, 789 So.2d at 1131-32; Everglades Mem’l Hosp., 658 So.2d at 581.
In reaching this conclusion, we are mindful of the discretion allowed to a public body in dealing with bids and competitive proposals. As argued by the County and cited by the trial court as the basis of its order denying relief to Accela and CRW, “a public body has wide discretion in soliciting and accepting bids for public improvements and its decision, when based on an honest exercise of this discretion, will not be overturned by a court even if it may appear erroneous and even if reasonable persons may disagree.” Liberty County v. Baxter’s Asphalt & Concrete, Inc., 421 So.2d 505, 507 (Fla.1982). The same principle applies to competitive proposals as well as bids. See Emerald Corr. Mgmt., 955 So.2d at 651. However, we conclude that that County went beyond the bounds of its discretion when it violated its Procurement Code. See Dep’t of Transp. v. Groves-Watkins Constructors, 530 So.2d 912, 913 (Fla.1988) (noting that the rule that “an honest exercise of ... discretion cannot be overturned” does not apply when there is a finding of “ ‘illegality, fraud, oppression, or misconduct’ ” (emphasis added)) (quoting Liberty County, 421 So.2d at 507).
In sum, the trial court erred in denying relief to Accela and CRW. We therefore *1045 reverse the order of the trial court and remand for further proceedings not inconsistent with this opinion.
Reversed and remanded with instructions.
KELLY and CANADY, JJ., Concur.

. The Wisconsin-CSDC contracts were chosen among the several existing CSDC contracts considered by the County because they were the most recent Amanda contracts between CSDC and a government entity, a factor that the County felt would ensure the propriety of the piggyback process.

. At trial, CSDC pointed out that Amanda was “agnostic” as to the purpose for which its tracking features could be used.

. In practice of course, the County and the vendor must draw up a fresh contract. The degree to which this contract can diverge from the other government entity’s contract is a significant issue in the present lawsuit.

. We must read and construe the several sections of the Code in pari materia. See Bullard v. Lake County Code Enforcement Bd., 620 So.2d 1041, 1043 (Fla. 5th DCA 1993).

. The County and CSDC do not argue that any uniqueness inherent in the Amanda product means that the tracking software products offered by Accela and CRW are not "competitive brands.”

. Additionally, and as already noted, the County’s Mr. Haley testified that the piggyback process was supposed to be competitive.

. For the purposes of our analysis, we are omitting details of the few (not necessarily insignificant) discrepancies between the three pairs of agreements.

. See Black's Law Dictionary 1509-10 (8th ed. 2004) (defining ''term” or "terms” as “[a] contractual stipulation” and "[pjrovisions that define an agreement’s scope; conditions or stipulations”).

. There was some dispute as to what the word "extend” as used in the piggyback provision means and what stage of the contract-making process it referred to, that is, whether the terms "extended” to the County by CSDC *1044 were those of the Wisconsin agreements when CSDC ostensibly “offered” those terms at the initial stages of the contract formation process, or whether the terms "extended” by CSDC were those that appeared in the final County agreements. We note from our review of the record that it was not clear that CSDC ever "offered” the terms of the Wisconsin contracts to the County in the legal sense of that term. The Wisconsin agreements appear to have been merely one set of documents passed between the parties in the contract formation process; as noted, the terms of those agreements were considered by the County as a "basis to begin negotiations.” This view is not congruent with the definition of "offer.” See Restatement (2d) of Contracts § 24 (1981) (“An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.” (emphasis added)).
Instead, the contract formation process described by Professor Corbin in which there are no clearly delineated stages of offer and acceptance aptly portrays the County-CSDC interaction here and supports our interpretation of the "extends the terms and conditions of the contract” element of the piggyback provision:
The model of offer and acceptance does not describe all contract formation.
... There are ... many cases at common law ... where it is clear that a contract has been formed, but the process of offer and acceptance — if there was one — cannot be reconstructed. This may be true in a bargaining contract where agreement is reached in bits and pieces.
... In modern business transactions of large scale it frequently happens that the parties, often not just two, but a multiplicity of enterprises, negotiate a transaction with the understanding that the parties will not be bound until their agreement is finally and completely articulated in written documents that are signed and exchanged.... [A] proposed contract may be drafted, each party signing one copy. Upon the simultaneous exchange of documents, a contract may be formed without there being an identifiable offeror or offeree.
Arthur L. Corbin, Corbin on Contracts § 1.12 (Joseph M. Perillo, ed., West 1993). In such a situation, it would seem that the only terms that can be identified as having been "extended” or "offered” by the vendor to the purchaser are those that appear in the final executed contracts.